The two consolidated cases are before us. Max. Max. Max. Sasha, tell Bill Peters you can come sit with me. I didn't want him to paint me. What would you like? I know, I'm just saying, I didn't want him to paint me. I notice that counsel has, or somebody, has divided up your time. But I want to make clear that we will allow only one rebuttal on behalf of the two cases. Is that all right, to have one rebuttal? I know there are two parties. I know, they'll see what they say. Yes, well... What are the plans? Derek Braslow for the appellant Joseph Colacicco. Our plan was to submit our entire case within the first 30 minutes and then save five minutes for rebuttal, and I would handle the rebuttal. Oh, that's fine. That's a good thing. Okay. Okay. We may have questions, so it may go on. We'll try to advise the audience. It may go over 30 minutes in this case. Okay. Okay, Mr. Braslow. Thank you. May it please the Court, my name is Derek Braslow. I represent the appellant, Joseph Colacicco. As I said, we're reserving five minutes for rebuttal. Thank you. Obviously, this case is essentially, as I see it, preemption. The FDI has now taken the position that there is preemption, and your primary argument is what against preemption? Well, there are major points. First, with respect to deference, is that it was inappropriate to entitle... And the lower court, what the lower court said was... You're talking about Judge Baleson's opinion. Yes. Judge Simandl's opinion, exactly to the contrary. That's exactly right. Oh, let me just... Excuse me. Is there any difference on the merits of what's before us between you and McNellis' lawyers? Well, we're talking about two different antidepressants. I know that, but on the preemption issue, which is the issue that Judge Simandl certified to this court, I didn't notice a difference in the brief. No, there's no difference. Okay, that's what I wanted to know. I'm sorry. Now, go back to Judge Ambrose. Okay. I asked about preemption, and he was saying also there's an issue relating to deference, which is a predicate for that. Yeah. That's right. I guess first with respect to preemption, there's no preemption in this case because, first, Congress has never explicitly given or said that these types of cases warrant preemption. And second of all, there is no under-implied preemption conflict analysis. There is no conflict or impossibility between complying with the common law claims at issue. Well, excuse me. Going back to what you just said, there's, under the doctrine of conflict preemption, you're saying you can't, unless there's express preemption, you don't have preemption? There's a whole doctrine out there, which the Supreme Court has accepted. It wasn't me. No, I'm not saying that, Your Honor. It's fabulous, if you were, because you said the reason there's no preemption is because Congress hasn't said there's preemption. Well, I think you begin your analysis of implied conflict preemption by looking at what the intent and purpose of Congress was in promulgating the FDCA. And we know what that was. And Judge Simandl said as much in his opinion when he said that the FDA or Congress's stated intent that the FDCA must not weaken the existing laws. But, on the contrary, it is to strengthen and extend that law's protection of the consumer. And once we begin with those goggles, that presumption against preemption, and then we look at the implied conflict preemption analysis that the court is required to go through, it is, in my mind, it is a straightforward process. And what the court should look at is whether or not the common law claims in question pose a direct and positive conflict or an impossibility conflict with the federal law in question. Do you represent Pfizer or Smith-Prime? No, no, I think you represent the plaintiffs. Oh, the plaintiffs, okay. Well, all right. Well, Pfizer argues that the presumption against preemption doesn't apply to in conflict preemption cases. What's your position on that? Well, no, that is not the case, Your Honor. Well, I didn't think you were going to say that. Why? First of all, we're talking about a longstanding common law claim that the states have traditionally, this is a field in which states have traditionally protected the safety and health of their citizens, on top of it being an issue of a longstanding history of tort litigation in this area. Based on that, and the case that Pfizer relied upon in the Geier case, the Supreme Court in that case was looking at the issue through a neutral perspective with respect to the presumption of preemption, because there was an express preemption clause and a savings clause in that case. How do you distinguish our opinion in Zeneca, which we are bound by? Well, Your Honor, there's three factors that I look at in distinguishing Zeneca. First of all, the Zeneca opinion was specifically with respect to drug advertising regulations. This case is with respect to drug labeling regulations, and also with respect to Zeneca as far as the facts and the claims are concerned. Zeneca was about consumer fraud laws and state consumer fraud laws versus our claims regarding deeply rooted common law personal injury suits, a field, as I said, that's traditionally occupied by the states and provided a long available form of compensation to injured victims. The holding in Zeneca was really based on principles of field preemption, and the court in making its holding in Zeneca found that the regulations with respect to drug advertising were so extensive and so specific that there was an obstacle. But in real terms, the holding was based upon a field preemption analysis, and that's not the case here. As I said, the purpose of the FDCA from the beginning was not to displace state law. The 1962 amendment specifically speaks to that, and Congress has spoken. And really, that's what we're talking about when we're talking about preemption, the purpose of Congress. I may be oversimplifying this, but to me, this case doesn't have to do with the preamble presumption or deference. It has to do whether there's an actual conflict. And they say there is an actual conflict, that FDA, in making these pronouncements about SRRIs, basically decided the labeling issue, and there's an actual conflict. And if there's an actual conflict, it doesn't matter what the presumption was. It's gone. Deference to the preamble doesn't matter. It's gone. So the question is, is there an actual conflict? Am I oversimplifying this? No. I think it can be that simple, Your Honor. And our response to that is, no, there is not an actual conflict. At no time did the FDA, at any time, reject a proposed warning from either Glass or Smith-Klein. Well, that's where we're here. Do they have to propose the warning in order for there to be an actual conflict? Or can it be a rejection of a request by somebody else for the same warning? You're saying it has to be their request. Does it have to be their request? I'm not only saying that. Okay. I'm saying more than that. I'm saying, first and foremost, you have to have a request to strengthen the warning. If you don't even have that, the FDA, in no instance, in the entire record, can they point to one document, which shows that the FDA came in and said, no, you are not required to strengthen this warning for your antidepressants. The FDA said more than that. They said, we don't want you to change the label that we've approved because it will confuse people, and people who might get help from the drug won't take them if you put too many warnings on them. Wasn't that basically the FDA position? No, with all due respect, Your Honor, yes, that was the FDA position. Okay. Well, that's a little different than no. Okay. Yes. The FDA, yes, the FDA came to that conclusion. Okay. So why isn't that a conflict going back to Judge Rastani's question? Why isn't that a conflict? Because that conclusion was based upon evidence that the FDA didn't have. But that's a different point. You may tell us that the conclusion was erroneous or an abuse of discretion, but if there's a conflict, I gather you can see that there is a conflict. Right. But when we're talking about a conflict, we're talking about looking at regulations, federal law, and comparing them to the common law claims, and nothing in the federal regulations specifically. In fact, the regulations say just the opposite. The regulations specifically mandate that drug companies come forward to strengthen their label when there's an association between their drug and a hazard. Between the time that FDA last said for SRRIs, there is no substantial relationship between suicide and the drug. Between that time and the incident that you're complaining about, what new thing happened that you're alleging, or what new thing do you allege happened? What's the thing that happened between that time when they said no and the incident? Our complaint, and we're talking about a motion to dismiss. I know, so I want to know what you're alleging. Our allegations are that prior to 2003, prior to the suicide in question, that GlaxoSmithKline and Apotex had information, and they knew that these drugs caused suicide. Are you talking about the same information that had been out in the public domain, the published studies? No, we're talking about information within the control of these. You have to understand that the manufacturers that control the clinical trials and the data and the studies, they put together all the information, they give it to the FDA. It's their responsibility to come forward to the FDA and say, look, this shows that our drug causes suicide. So you're alleging, you alleged in your complaint, that there was some information that was proprietary to them that they got between the time that FDA last rejected the warning and the suicide. In that time period, something happened, and you allege that in your complaint. Well, first of all, the FDA never rejected the warning, the strengthened suicide warning. That's the first point. And the second point is our complaint. Are you sure about that? And I've been reading this very carefully. I thought the FDA said that repeatedly rejected the warnings that kind of speak here. Yeah, the FDA comes out and says a lot of things in their briefs. No, are you saying it's a lie? Yes, that's not true. Are you saying that it's because it was for another SRI that they made the statement? Or are you saying they just never rejected a warning that SRIs increased the chance of suicide? You're saying they never did that. Here's what I'm saying. This series of approvals and re-approvals for the drug and or FDA talk papers and press releases, they do not reject a strengthened warning for SSRIs. That's not what this correspondence between the FDA and the drug companies say. All it does is say that we're re-approving your label for a new indication. But that does not amount to a conflict where the drug company is saying that you can't strengthen your warning. From the beginning, the drug companies had information which showed that these drugs cause suicide, our complaint. And, in fact, Judge Belkin found that our claims for fraud with respect to GlaxoSmithKline were specific, in that we claim that they misrepresented and they manipulated the data when they presented it to the FDA, such that the FDA's opinion on this issue. So you say that you've alleged fraud on the FDA and that survived the case law? No, we're not saying that. Okay, I'm having a hard time figuring out what you're alleging. Okay, we're alleging that prior to October 2003, the drug companies, in this case GlaxoSmithKline and Azotex, had information which showed that their drugs can cause suicide. Prior to the suicide in question, and at any time prior to the suicide, none of the drug companies came forward and strengthened the label, and the FDA at no time told those drug companies that they could not strengthen the label. In fact, doing so would go against the actual regulations themselves, which required drug companies to strengthen the label. You're saying that prior to, they had the primary information prior to 2003 that shows these SSRIs in question could cause or could enhance the possibility of someone committing suicide? Well, the standard for strengthening the label is that they're just associated with suicidality. In this instance, not only are they associated, but that the drugs actually cause suicidality. Is that precisely what you want? Because the precautions of the label say, the possibility of a suicide attempt is inherent in major depressive disorder and may persist until significant remission occurs. Close supervision of high-risk patients should accompany the initial drug therapy. Now, what exactly do you think they should have said? They should have put in the warning of the label that their drug, Paxil, in this case, or Zoloft, or generic Paxil, was associated with an increased risk of suicide. Now, is that what everything in the country would have required under the state tort law? The federal regulations themselves require. No, no, no. My question to you is, under state tort law, is it your position that the tort law of every state is the same with respect to the warnings that should have been put on the label? I think generally they're similar. Generally? Are some different? Well, in some instances, there's not. With respect to a learning intermediary, it's another issue. My next question, which you may have inferred, is, if you're a drug company and you're distributing your drugs throughout the country, can you assume that your label, should you change it, would be acceptable, or will some states say, no, you shouldn't have? And it's not only state law, because it's also state decision. What is a drug company supposed to do unless the FDA says, this is what you should have? Well, they're general principles. They have a general duty of care, an obligation to act reasonably, when they become aware of evidence that shows that their drug is associated with a risk. Why isn't doing precisely what the FDA says you should put on the label, or it will be misbranded, why isn't that precisely what they should do? Well, one, that's not what happened in this case. The FDA didn't tell them that your label will be misbranded if you strengthen the label. But they are required to have a label that follows precisely what the FDA says, and the FDA approved their labels. Well, first of all, we're not talking about an FDA approval of a drug or an FDA scientific decision. We're talking about the labels. We're not talking about the drugs right now. I understand. With respect to the labels, the fact that the FDA decides that the label, in fact, should say X, or it makes a determination that it should warn about a particular risk, that does not amount to an authoritative message of federal law. Under SPRESMA, the Supreme Court said as much, and even in that case, they decided not to take on a regulation requiring manufacturers to install propeller guards in their boats. The fact that they did not decide to take on a regulation meant that that was not an authoritative message of federal law. That's a different statute, right? Yes. Your description of the facts of these cases isn't what I recall. I thought that there was a whole bunch of activity at FDA because of Prozac, and that's where they came to their conclusions about SRRI, and they kept saying there's no scientifically established relationship between suicide and these drugs. Now, I've never seen in your brief a statement that Paxil and Zoloft, I guess Paxil for you, is not an SRRI. That's true. So are you telling me now? That's SRRI. That's SRRI. Okay, thanks. I got my initials wrong. SSRI, that it's not one of those things? No. Paxil is considered part of the class. So you can't stand here and say that FDA never made a decision that there was no substantial relationship, and therefore would not have approved that labeling at that time. Based on the facts before it regarding Prozac in 1991, the FDA made a decision regarding what it thought. And it adhered to it. Well, yes, but that never stopped Eli Lilly from coming in at any point if it had evidence. In fact, it was required to. So you think that there's some secret documents that they had before 2003 that established this, that they didn't let anybody know about that, and I want to know how that isn't a fraud on the FDA claim. Well, this is a fraud. I'm not saying that they did not manipulate the data and convince the FDA to approve their drug based upon misleading data. That's not what I'm saying. Our case is about fraud on Ms. Colachico's position, not on the FDA, which takes it out of the realm of fraud. Okay, we're talking about fraud on the FDA. I'm sorry, I'm talking about fraud on the doctor, not on fraud on the FDA. Now, as part of that, and, you know, I think the answer to your question, and Judge Simandl addresses this in his opinion, and it's going to go on page 10 and 11 of Judge Simandl's opinion, and he states that the only limiting regulation is that the warnings not be false or misleading. Here, the question of whether the FDA would have so acted can only be answered when it's clear what Pfizer knew about the link between Zoloft and suicidality. Whether, as plaintiffs allege, the company withheld crucial information on that issue from the FDA in seeking approval and reapproval of the drug, thus, if plaintiffs can demonstrate that Pfizer had knowledge of a heightened risk of suicidality, which should have resulted in enhanced labeling beyond the FDA-approved warning, the FDCA does not preempt that response. Now, I see you have your red light on, but you can't sit down until we finish our questions. And I would like you to answer something we haven't been talking about so far. How do you answer Apotex's argument that the Hatch-Waxman amendments preclude the generic manufacturers from changing their drug labels before or separately from the principal drug manufacturers? Specifically because the Hatch-Waxman amendments deal with regulations and drug approval up to the point that the drug is approved. They do not deal with post-approval regulations. So do you mean the generic label could be different from the label of the principal drug? I don't know what to call it, the mother drug? Well, under 314.70 and 201.80 or 201.578, which was in place at the time, the regulations do not distinguish between generics and brand-name drugs. It's very clear. But aren't the generics have the responsibility of following precisely that which the mother label has or does? And isn't that the whole point of the Hatch-Waxman bill? I mean, they went to Congress and said, look, we're just, you know, me too. And they said, that's fine. You'll be protected. No. The purpose of the Hatch-Waxman amendments was to allow a streamlined process for generics. Sure. I'm talking about the labels. As far as the labels? Yes. Before a generic is approved, they must be the same as the brand-name labels. Are you telling us, I guess maybe you are, that a generic drug manufacturer has the right under this regulatory scheme to have a label that's different from that of the mother prescription label? I'm saying that the generic drug manufacturer has an independent duty. If that company becomes aware of a risk under the regulations, 31470 and 20180, and in fact, 20180 applies to manufacturers, right? 20180 applies to manufacturers. I'm sorry. I presumed by manufacturer I was thinking it was not the one who makes the generic, but rather the one who makes the drug from which the generic comes. No. 20180 and formerly 20157 applies to both generic and brand-name manufacturers, and 31470. And 31497 actually reinforces this. Could you go back to my question? Yes, Your Honor. My question was, if Apotex, does Apotex have the right under the statute and under the regulatory scheme to come up with a label that differs from that of, I guess it follows the Smith-Simes, GSK or whatever it's called now. GSK. Could it come out, could it say, oh, well, we really think that there's more danger of suicidality, and therefore we're going to put that on our label even though GSK doesn't have it. Do they have the right to do that under the statute? Not only do they have the right, they're required to do it under the statute. We're talking about the Hatch-Watson amendments don't overcome the purposes and objectives of the FDCA in protecting the public. And secondly, we attached this supplement to our brief, the September 2006 draft guidance from the FDA. And what they said in their own draft guidance, and these are their own words after we filed the lawsuit, is specifically, nothing in this guidance is intended to expand the circumstances in which an application may affect labeling changes via a changes supplement, and particularly those pertaining to generic drugs. 314.97, on top of that, says specifically the applicant, and we're talking about generics here, the applicant shall comply with the requirements of 314.70 and 314.71 regarding the submission of supplemental applications and other changes to an approved abbreviated application. Nothing. In fact, there's no regulation which says that they can't, and they must, according to 20180. The whole idea here is to protect the public from dangerous drugs. If the FDA is now saying, look, there may be items out there that cause some confusion as to what the manufacturer should do, we, the FDA, are now telling you, this is how we interpret what you should do. And they're now saying, if you look at the 2006 preamble, that their label sets a floor and a ceiling. I guess the question coming at you is, why isn't that the last word? Well, because it's directly contrary to what the FDA regulations say themselves. Not only are the regulations plain and unambiguous, but that FDA position is directly contrary to the position that I'm in. I guess that's what allows you to say that it isn't just a case of preemption, it's a question of how much deference you should give to the FDA in this circumstance. Well, that's true. Because the FDA has come forward and said what it believed, and, well, basically told this court that, not to interpret the conflict analysis, but basically has told this court that it's the arbiter of what the law is. And they've said that there is preemption here. And they've said that their labels amount to a floor and a ceiling. They don't get to do that here. This is where the FDA's position, its inconsistent position on this issue, makes that position very, gives it very little persuasiveness, and the fact that the regulations in question are unambiguous. So if you were writing an opinion that would go your way, what would you suggest would be the level of deference we should give? Would it be lead? Would you give it some weight? Well, the Supreme Court in Bates addressed this very succinctly in 2005, and they said that the agency's position was particularly dubious, given that five years ago that it took the opposite position. In this case, with respect to the issue of preemption, Congress had never specifically delegated or given the authority. But you're mixing and matching. My question to you, you started saying to me when I mentioned preemption, you said it's a case of deference. I'm now asking you a question on deference, and you're answering by preemption. How much deference, if you were writing an opinion that went your way, would you give to the FDA? None. None? None. As in zip? Well, as in zero. That's what the Supreme Court did in Bates. And this is because, and I'll say this again, the regulations in question are clear and unambiguous, and the FDA position has changed. Now, if the answer is none, that's the result, what analytic tool would you use to get there? That was really my question to you. Not how much deference. What tool would you use to determine how much deference you would use? I said none. No, no, no, that's different. Okay. None is how you say you'll give no deference at all. Why would you give no deference? What mode of analysis would you use? Forgetting how it comes out. Right. Would you use need analysis? That's really a softball. It's skid more. It's whether it's persuasive or not to this court. Whether or not the court agrees with the FDA opinion. It's like any entity that would write a brief, if you're persuaded by the FDA opinion that it's right, then that's the amount of deference it should get. Okay. So that's the 44 cases I write. I'm sorry? Yes. And 4,000 law review articles on what skid more means. Okay. Thank you very much. My name is Saul Weiss and I'm here as an appellee because Judge Simendel found the woman. We understand the cases have come up, but you're still on the plaintiff's side. That's why you're arguing now. You're correct. Okay. We understand that. I'd like to address the court with some facts I think are important. You only reserve five minutes. I understand that. Okay. I want to just interrupt you here a second. In your case, you had discovery, right? Yes, we had limited discovery, correct. Limited discovery. What happened is a motion was filed, a statement the case should be dismissed because it's preempted. Judge Simendel said he denied it and gave us 120 days to come back with evidence that we had found that Fizer knew or should have known that there was an increased risk of suicidality when people with depression took Zoloft, and we did get that discovery. But before the 120-day period was over, Fizer again refiled and asked based on the preamble that Judge Simendel changed his opinion and refused to do so. And that's the posture right now. And you found the secret information? It's not so secret. It's in the public domain, isn't it? Some of it is and some of it isn't. And some of it's protected by confidentiality orders, and that's why they're not in the brief. But the point that I want to make is that we approved. I signed an order approving filing volume 7, whatever volume that was. I'm not sure. Whatever the motion was, I signed it. That's a different issue. No, no. On confidentiality. Did you have a motion to be able to be – did somebody have a motion? Somebody had a motion to take judicial notice in the first case where it wasn't in the record of the FDA orders or pronouncements on the SRRIs. I believe that's the motion. It's actually in our case. But weren't most of those things already in the record in your case? Yes. Yes, because of the discovery. You're right. But they weren't in the other case. What I'd like to address in any case that I have is that the FDA doesn't conduct clinical trials. The FDA doesn't prescribe medication. That's unlike the National Highway Transportation Administration, which does do extensive trials. And the FDA can't even subpoena for it. No. So it's a whole different regulatory scheme here, and you have to put that against the backdrop of the common law failure-to-warrant cases which have been around since the beginning of our Constitution. There's nothing inconsistent with an injured person coming into court and alleging that his or her physician wasn't given adequate information about the safety profile of the drug. The FDA doesn't bar that. The FDA is limited in the Drug Manufacturing Court over that. Excuse me. Is your issue that the physician wasn't given sufficient information, or is it that the labeling didn't adequately warn the ultimate patient? No. It goes to the physician. The physicians are not the plaintiffs. Physicians prescribe the medication to the plaintiffs. Well, we really understand that a prescription drug is a prescription drug. Yeah. And those states, Judge, you have to, the only duty to warn goes to the prescribing physician, not to the consumer. You just have to give them bread. I understood what you just said to be that the information given wasn't adequate as distinguished from the labeling. That's how the information is conveyed, through the label. It's all a big insert, right? That's correct, product information, product insert. That's how the drug companies primarily provide the treating doctor, the prescribing doctor, with the information so the doctor can make the risk-benefit analysis. And that's different than the facts you have in your arm. And that's why there is no conflict. There's no impossibility. And that's why it's important to have litigants come to state court to throw chunks on what it is that the drug manufacturers actually have in their clinical trial data. And, by the way, the FDA doesn't necessarily analyze the data. It takes the data as it's given to it from the manufacturers. The plaintiffs in Guyer said that there should be supplemental restraints. Is that correct? Yes. And you're saying that the difference from that case to this is that's not a case of warning? The difference is, in Guyer, you had a completely mature regulatory framework. When the regulatory agency had extensive testing and analysis to determine what was reasonable in the circumstances. You don't have that here. Going back to the question, but the plaintiff is McNellis and Carluchico, even though the notice was to the doctor. The reason is, obviously, they died. But what was the harm? You're saying if the notice was given correctly to the doctor, the doctor had given the notice correctly to the patient? No, the doctor makes a decision whether or not to prescribe a drug based upon the profile of the drug. And the doctor can't make the decision whether the benefits outweigh the risk unless the doctor knows what the risks are. And so you'll find, for example, in the Fodger position, they claim the FDA, on five different occasions, approved Zoloft for different uses. But the first one was for major depressive disorders. After that, it was OCD and panic disorders, and they were urging people to commit suicide with those problems. The issue really becomes there's an increased risk for people who are depressed when you get these antidepressants that they can commit suicide, and the physicians didn't know that. They weren't told it. And therefore, they were unaware when they prescribed the drug what steps to take when they prescribed it to ensure the safety of the patients. And that's what we have here. I just looked at the collateral complaints. Is your complaint the same? You alleged fraud on the general public. No, I did not. What did you allege? We allege there was a failure to warn the physician of the increased risk of suicidality when patients are administered Zoloft from depression. And this has nothing to do with labeling, then? It is to do with it. The way that the drug companies notify the physicians is through the label. We can give them seminars and other things, but primarily they do it through the label. The FDA says if it's not on the label, you can't discuss it with the physician. So your argument is that they had studies, which they failed to analyze properly, or they had analyzed properly, and they should have told the FDA about those studies in order for FDA to tell them to put it in the insert. No, it's a little simpler than that. They analyzed the clinical trial data. Based upon their analysis, they come to some conclusions as to what the risk profile is of the drug. We're saying they should be able to tell that to the physicians. Well, they can't. They have to put on their label what FDA allows them to put on their label. But they negotiate. They have to negotiate it, but it all goes through FDA. But it's a negotiation. So what you're talking about is not a mandate by the FDA. It's a negotiation between the drug companies who are in business to make money, as they should be, and the FDA. But there's no way not to do this through the FDA. Absolutely correct. They could change the warning, if they wanted to, without having to seek prior approval by the FDA. That's what the regulations say. When they come upon, but ultimately the FDA has to approve it. No, they don't. You mean they can change the label, and they can have a label outstanding that the FDA never has approved? No. Once the FDA approves the label, and the drug company... Wait a minute. Let's go back to this, because you're not being consistent. You said they had the information. They could put it on the label, and that's right. They could put it on the label, as I read this, before the FDA approved. But ultimately the FDA has to approve. Otherwise, it's misbranded. If a drug manufacturer has a label that the FDA hasn't approved, under the regs, isn't that misbranded? Not necessarily. You mean at some point? After the drug has been approved for market in the United States. We're not talking about the drug. We're talking about the labeling. Well, that's part of the process. Once the drug is approved, there's an approved label. That's right. Well, the additional information then becomes known to the drug company. You're saying they can put that warning on the label. After it has been first approved by the FDA. I understand. And what I'm saying to you is, for how long can the drug company persist in having a label with a warning that was not approved by the FDA? Initially approved by the FDA? No, I'm talking about precisely what you were talking about. I mean, if you don't want to listen to me, fine. I understand where we are. You said that a label gets originally approved. Then the drug company gets more information about increased risk of suicidality. Right. And as I understand your position, it is that the drug company can then, or should then, increase the warning on its label. Really, they're down as precautions rather than warnings, but you say they should be on the warning list. They can be on the warning list. They should be, and they can market the drug with the label that is in addition to the label that the FDA. Now, we got there. My question to you is, how long do you think the drug companies are required to continue with a label that has a warning in addition to the label that the FDA has approved? As long as the data supports the warning. And that can go on for years? Yes. And so, wouldn't it then be misbranded because they are marketing a drug with a label that has not been approved by the FDA? No, because the regulations allow the drug company to continue the warning. For how long, is my question. Okay. Well, we'll hear from the FDA ultimately. Thank you. Thank you very much. Well, there's a question between what the regulations require and what happens in practice. Okay. May it please the Court. I'm Charles Becker here for the Amicus Curiae, Pennsylvania Association for Justice. Judge Embrill, I'd like to return to a question that you asked about deference. And you asked the question, what was the analytic tool that might be used to conclude what level of deference should be accorded to preamble? And I would agree with my brother counsel that I think Skidmore is where you begin that analysis. But let me also say that a Skidmore analysis, I think in this case, leads you basically to need. In Skidmore, we look at a number of factors. You look at the consistency of the agency position, its level of formality, the expertness of the agency with regard to the issue in question, the overall persuasiveness of the document. Now, much has been said in the briefs about the level of consistency and formality that might be said that the FDA preamble has. And it has been certainly argued in our briefs that there is very little consistency and very little in the way of formality. But what I'd like to focus on here for a moment is expertness. Because what we are talking about with regard to the preamble is not a statement about how many parts per million should be in the air or the water or some other matter that might be truly within the expert province of the agency. We are talking about a construction of the supremacy clause. We have an executive agency issuing an opinion of constitutional law. And when I was last in law school, I remember that opinion by Chief Justice John Marshall, where he said it is emphatically the province of the judiciary to say what the law is. And I would respectfully suggest that the Food and Drug Administration is not an expert regulator. With regard to this issue here, obviously, a lot of it goes back to Justice Frankfurter. How much deference do you give agencies who are charged with the authority in a particular area, and by virtue of that charge, the public perception and the perception of the judiciary that they have an expertise, one might even argue among federal agencies, a unique expertise. And so I thought that your co-counsel, Mr. Braslow, was perhaps on the right track by saying, okay, what level of deference do we give? And you might want to go through the four factors one by one. Sure, I'd be happy to. With regard to consistency, I would suggest that the FDA preamble has very little consistency because although there have been some amicus briefs before the preamble that were in line with the preamble, historically the FDA has not had a view that there is preemption in the area of common-law prescription drug litigation. And moreover, the FDA in 2000 and perhaps in other occasions has gone exactly the opposite and said clearly there is not preemption. So at a minimum, the FDA's current position does not square with its prior positions. And so on consistency, the one thing you can be sure of is that they are not consistent. I have a problem with finding any inconsistency with regard to the narrow preemption claim in this case. I mean, if the claim is actual conflict between what the FDA has ordered in the label and what the plaintiff says should have been on the label, and that's the case of actual conflict, I don't know that the FDA has said that in that narrow situation previously that there is no conflict, there is no preemption of state law, if you get down that narrow. Well, the FDA certainly has said in the past that it views the common-law tort system as an important and necessary adjunct to the regulatory process. Generally, there seems to be a conflict. I'm just not sure there was ever a conflict between their view on something that approached this case and, you know, before and now. I mean, if you look at the idea of preemption very narrowly, which is what the government is arguing here, I'm not sure it was addressed. You know, there is a battle of language that is going on in this case, which I think is interesting to observe. If you were on the defense side, or if you were the FDA, the language you use is one of requirement, mandate, and conflict. If you were on the plaintiff's side, the observation is that what the FDA really does is approve by a process of negotiation. And, indeed, with regard to the relationship between the drug companies and the FDA, it seems that when they are relating to each other, they talk in terms of agreement and negotiation. But it's only when they get the litigation that finally they have an episodic moment and realize that, in fact, they're in moral conflict with each other. Well, I read this preamble pretty carefully, at least the pages that resulted here, and there was not a lot of things that I would call terribly definitive. That's why I'm not sure there's such a great conflict. I mean, they do talk about, well, it should happen this way, and, in practice, it happens this way in practicalities. That's the kind of language they use in this preamble. Well, and the practicalities are important because the practicalities here are that drug companies, as Mr. Weiss was relating earlier, do have an opportunity and, indeed, an obligation under federal regulations to enhance the warning. For how long until the FDA? Do you agree with them forever? Well, the FDA can bring an enforcement action if, in the end, we can imagine a scenario where a drug company enhances a warning and nothing happens because the FDA basically agrees with it. We can imagine a second scenario. In America, has that ever happened? Not in Iran, but I don't know. But what I also believe has never happened is that the FDA has, I think, certainly it's not reflected anywhere in the briefs, it has never filed an enforcement action to formally, in district court, to formally require an agency, I'm sorry, a drug company to withdraw. And it seems to me that, with regard to conflict, that there is an important process that has to be gone through before one might say that a conflict has risen. Mr. Packer, we gave you five minutes and it's up, but I think you should finish answering Judge Amber's question because you were going through the four factors and you got, so why don't you sort of quickly go through the other three. With regard to formality, this is a preamble that appeared one fine day in the Federal Register and we woke up and realized that the constitutional law scholars at the FDA had decreed that there shall be no more lawsuits. This was not subject to notice and comment. This had none of the rigor and public openness that I think would attend a regulation or other statement by an agency that should be a court of deference because ideally the regulation, but otherwise the pronouncement, had gone through a rigorous process of public scrutiny. There was none of that here. With regard to expertness, I suggested earlier that it remains the province of the Article III power to decide what the law is and that an Article II agency doesn't get to say what the supremacy clause means. And at the end of the day here, no one is saying that the statute is really ambiguous. No one is saying that they can't understand the regulations. The FDA position and the drug company position is that in the practical, in the real world, there is a conflict within the meaning of the supremacy clause or really a conflict within the meaning of preemption doctrine, which is an expression of the supremacy clause. So at the root of this, this preamble is a construction of the Constitution and they are not expert regulators of that. Finally, as to persuasiveness, I would suggest that the preamble is not persuasive because it asks drug companies to take action, or rather to not take action in a matter that is inconsistent with FDA regulations, that is inconsistent with the FDA's own past statements regarding preemption, that is inconsistent with Congress's decisions over the years since 1938 and 1962 and as recently as 2003 and 2004 to affirm the vitality and indeed the necessity of common law actions and thus also inconsistent with at this point coming on 70 years of litigation, of failure to warn claims that has occurred against the backdrop of the FDA. Thank you very much. Judge Goldberg, thank you for allowing me to be here today. Thank you. We'll hear from your friends on the other side. May it please the Court, Sheldon Varner for Defendant Appley, Blacksmith-Kleiner, GSK, and Colachico, and I will have the lectern for 10 minutes. I'm going to eat you. The issue before the Court is sharply defined. Please claim under state law that the defendant should include in the warning for their antidepressants that the FDA has said repeatedly would violate state law. Let's just make sure we have the facts here. You never presented evidence to the FDA and say, please let us warn of suicidality. What happened is in connection with another drug, which was an SSRI, they said there's no substantial evidence. Isn't that what happened? And therefore, the labels they approved never included this for adults up until 2003 or after. I don't know, but that's up until the event in question. Your Honor is correct.  requesting a warning, essentially functionally the same as the plaintiffs asked for in this case. No citizen's petitions related to Prozac of the class of SSRIs. But quite apart from that, the FDA has watched this issue of possible association between suicidality and SSRIs over the entire span of years from 1991 through 2007 was the latest labels that they have approved. They have asked manufacturers for more information. They have suggested new methodologies to the manufacturers for reviewing that information. FDA has repeatedly reviewed the information over that 16-year period. I have said one. The latest label that has been approved in 2007 says that there has been no reasonable evidence of increased risk of suicide in adults taking SSRIs like Ms. Colachico and Mr. McNelis. That is the latest pronouncement. I had trouble understanding his claim. His claim seems to be... He actually said he alleged fraud on the FDA and fraud on the public in his complaint. What is the status of those kinds of claims under the Supreme Court's doctrine? Okay, so how does that leave a fraud on the public since the warning comes through the FDA? We would agree with you entirely, Your Honor, that they are intertwined. In fact, if the argument is that the label should have contained a warning that the FDA has said would result in the product being misbranded, that is preempted. And indeed, in terms of there being some kind of fraud on the FDA, which has received, by the way, all of the information that went into the 2007 label with no change of position by the FDA, that claim, too, is preempted under the button test. They never... I mean, they never come right out and say it would be misleading to warn of a connection between suicidality. They don't say that. I mean, the argument is, well, there's possible exposure to that kind of claim. They haven't gotten that far. They basically decided they hadn't seen enough to require that warning. Indeed, they have taken the position in this case and in several other cases... of this label. I mean, the warning that the plaintiffs want would have made the product misbranded. And they have taken that same position. Did you ever... Did your company ask the FDA for permission to add an adult suicidality warning? No. For people of the age of Ms. Colachico and Mr. McNellis, there was not ever any reasonable evidence of association with a serious hazard. And so that's your position as to why you didn't ask for it. Indeed, that's correct, Your Honor. Now, let me ask a question as to what your argument is. What kind of preemption are you arguing for? We are arguing for implied conflict preemption. Now, pages 88 to 91 of your brief said this is a case of express preemption. That phrase referred to the language in the 1962 Kefauver Amendments that say that there shall be no preemption except where there is a direct and positive conflict. That is an express exception to the no preemption view of the 62 Kefauver Amendments. But as you and I understand preemption, it's really not express preemption that you're saying. There's nothing in the statute that says that the FDA can't preempt state law. Except for where there is a direct and positive conflict under the 62 Kefauver Amendments, which is what we represent exists. You're saying that there's an express allowance of the ordinary conflict implied conflict preemption. Indeed, Your Honor. And we are not dealing with a speculative hypothetical here as to whether a conflict exists. We know exactly what the plaintiffs say shouldn't have been in the warning. It's in their complaint and it's in their brief here. It is that the manufacturers should have said that SSRIs cause an increased risk of suicidality in adult patients. Again, we know, as Judge Baleson found, what the FDA's reaction is to that warning. It rejected it in 1991. It rejected it again in 1997. And it has rejected it every time that it has approached negotiation dozens of times with the SSRI manufacturers in the years since. 1991, again, ending as recently as 2007 with an approved label that says there is no reasonable association of evidence under the same increased risk. That it would have been misbranded if the drugs of your company had added a warning that you find would not be supported by the evidence. That's basically it. Is that right? Yes, Your Honor. The statute itself and FDA regulations say that when FDA approves a label, that is a pronouncement. Not only that there are no affirmative misrepresentations in the label, it is a pronouncement that there are no material omissions. I'm sorry. Has the FDA ever prosecuted a drug company for over-warning its customers? I know that the FDA has required that a change made pursuant to 31470 be modified or be withdrawn and modified. I believe those papers were attached to Farmer's Amicus brief in this case where Wyeth made a change as being an effective supplement for its antidepressant. FDA agreed with it and told them that they had to substitute additional language. So that is one concrete example that's before the court. There are interesting before and after facts here, both in McNellis and in Colachico. The FDA approved new labels for Paxil and for Zoloft shortly before the tragic suicides that brought about these lawsuits. In our case, for Paxil, a new label was approved less than two weeks before the date on which Ms. Colachico died. What did the new label add to the then existing label? Nothing in terms of an increased risk of suicide. It simply approved the drug for an additional indication. That is, it could be used for one of the anxiety disorders that it had not been previously approved for. And then again, shortly after the suicide, FDA once again approved the labeling. Each of those labeling approvals requires FDA to look at all of the data that they have, and of course the manufacturers are under regulatory duty to report any adverse events and any new information that would make a material difference. Does your company have what Judge Rossani referred to as secret data, another word which I assume she meant a drug test that hasn't been made public? In terms of Paxil, all of the information about the drug and all of the clinical trials that have been performed on the drug are available on websites and are available at FDA. All of that information is available. Indeed, Judge Baleson found in our case that there was no fraud on the FDA claim, and that finding has not been appealed in this appeal. How do you interpret the Supreme Court's recent decisions in 2005 in Bates? Bates was really a different situation where the agency had waived any right to rule, analyze, and rule on the efficacy of the drug. But the Supreme Court did rule 702, did it not, that the preemption provision, the so-called preemption provision, did not preempt state law? The Court reached that result, but we think that's a very different situation from the one here where you've got the federal government saying you can't put this in your label because it would render your product misbranded. But there that was a statute, right, under Bates? It was a different statute. It was a statute. It was a statute. And here you're talking about a regulation, are you not? No, we're talking both about the statute itself and the 62 Kefauver Amendments that say you can't have state action. It must have been a conflict, but then you have to show there's a conflict. And we believe that if you can't find a conflict on these facts here, it's hard to believe that you can find a conflict anywhere where you've got a federal agency telling you you can't put this in your label. Well, actually, there could be the situation where a drug company asked to put something in and it was denied. You could have that. Well, I don't know if it would be more of a conflict, but it would be kind of on a different category than what we have here. But I think when a federal agency, the expert scientific federal agency to whom Congress has delegated authority to make certain that prescription drug labeling renders that drug safe, unaffected, and an answer to the position that says you can't do it, and the plaintiff wants that state jury to say you can be liable because you didn't do it, that is just an irrevocable conflict. What did Judge Baileson do with Mr. Chikota's claim of fraud on the public? He didn't really deal with fraud on the public as separate from the general fraud claim. He found, first of all, that it is... He viewed the fraud of the public as the same as the fraud on the FDA because it all related to the labeling? No, he did not. In fact, he did find that there was no fraud on the FDA claim as such in the complaint, and that is not appealed here. The fraud on the position and the fraud on the public were kind of rolled up into one, and he found, number one, that no court in the country has found that a branded manufacturer can be responsible in tort to a plaintiff who took the generic version of the drug. That was his first line of attack under the Foster case. Second, he found that under Pennsylvania law, the Heim case allows only a claim of negligence, and so he struck it on that as well. Third, it's impossible, I think, to read Judge Baileson's opinion without concluding that he believed that the fraud claim was in fact intertwined with the preemption claim, that is, that it ought to be impossible to find that a claim made in labeling was fraudulent when it fully complied with the FDA's approval of that statement and the FDA's rejection of the very warning that the plaintiffs had urged. So you think we should infer that from his opinion rather than it being direct? Indeed, indeed, that does work. What is the conflict that you're alleging? The conflict is that a warning that has been declared adequate under federal law cannot be declared inadequate under state law, particularly for a warning that the federal expert agency has declared would render the drug misbranded. That is the conflict you're on. What about deference? What deference do you think should be given to the FDA? I think the FDA is entitled to deference on two fronts. I think, number one, it's entitled to deference on its scientific expertise. The plaintiffs talked a great deal about the 31470 regulation that allows the so-called changes being effected. That regulation has to be read in tandem with 21 CFR 20180, which says such changes to strengthen or increase the reliance shall be made only through there is reasonable evidence of association with a serious hazard. And that is FDA's bailiwick to make that determination. I think Skidmore and our combined, the agency is entitled to our deference, AUER, our deference on its own regulations, which it has interpreted. Thank you. Thank you very much. Thank you all very much. Your Honor, may I please have the court Sharon Swingle from the Department of Justice representing the United States as amicus curiae. I'd like to thank the court for allowing me to be here this morning. And we're very glad you are here. Because we have a lot of questions. 2006, you have a preamble. But was there ever any proposed rulemaking that explicitly stated or would state that the required warning is both a floor and a ceiling? Well, Your Honor, certainly the 2000 proposed rule noted that there were potential product liability implications of the new regulation. The 2000 rule says that they don't intend to affect federalism in that they're not going to jump into the bailiwick of the states. Is that correct? Right, well, if I can, Your Honor, I would say two things about that. I think first, with all due respect, the 2006 preamble and the statements in that preamble are not really implicated by this case, as I think Judge Astani suggested in her earlier question this morning. I think the issue in this case is narrower and is not one that depends on the view of preemption set out in that 2006 preamble. I will say, though, that the 2000... So are you saying, maybe as Mr. Braslow was saying, this is not so much preemption as it is deference that you wrote? Well, I do think we're entitled to a substantial amount of deference. Under what theory? Under several theories and, I think, for several different reasons. I think, in first part, the government's view here is informed significantly by its construction of its own regulations so that, for example, we have explained in our brief that the regulations simply did not permit a generic manufacturer to modify its labeling and that the CBE reg, even as to the manufacturer of a listed drug, would not authorize the manufacturer to put on a warning that had not been accepted or had been rejected by the CBE. This is where I get confused because in 2000, you put out something that says that the labeling, quote, does not have federalism implications or preempt state law, close quote. And now something's changed. What is it? Well, the rule itself does not preempt. The very promulgation of the rule does not displace by its own force all state regulatory authority in that area. I mean, let me just suggest that... Well, you gave a blanket statement that the guidelines for drug labels would not, quote, have federalism implications or preempt state law, close quote. That's seven years ago. The promulgation of those guidelines, and let me suggest, for example, that a drug that were put onto the market tomorrow without FDA approval would surely be subject to state regulatory action, notwithstanding the existence of the FDA's final drug labeling rules. But you're now saying what? I will say that... It's different than 2000. It is different than 2000, right? I don't believe so, Your Honor. But I think to the extent that that statement was ambiguous, as FDA explained in its 2006 final rulemaking, FDA's view was that its statement about the product liability implications of the rule gave sufficient notice. Are you telling us that the FDA position is that it has been consistent throughout? As to the issue presented before the Court this morning, absolutely, Your Honor. FDA has rulemaking dating back to the 1970s, stating that scientifically unsubstantiated warnings should not be added to the label for a drug. And I think where FDA has made a determination over and over and over again throughout the period in question... But the issue that's in McNellis that's certified to us is whether the United States Food and Drug Administration's requirements for the form and content of the labeling for the prescription antidepressant Zoloft preempted New Jersey's failure to warn law. Well, obviously, the United States has not taken a position in McNellis and did not file a brief. But that's the issue. I don't think that's quite a correct statement of the issue presented. Because in McNellis, as in Cochico, FDA had repeatedly determined that a particular warning was not supported by adequate scientific evidence as existed at the time, had declined to require such a warning, had rejected citizen petitions seeking such a warning, had again and again and again made an expert determination that the warning was not... You've got to bring me back. Judge Simandl certified the question I just read, did he not? That's correct. So that is one of the questions before us, is it not? Certainly in McNellis it is. I think there are narrower and broader theories of preemption that are available to the court here. I think there is a broader theory of preemption that implicates the 2006 preamble that would suggest that where FDA has approved a label for a particular device and the label reflects a particular risk, that any failure to warn claim premised on a failure to give a different warning would be preempted. Let's try again. Let's go back to Judge Slover's question. Is the FDA's position from 2000 to now consistent? As to the broader form or the narrower form? Answer it either way you want. Well, let me just be clear. The government in its brief filed with this court and in its presentation this morning is relying on a narrower form of conflict preemption. It is not our position before this court. We think the court need not decide the broader question whether the mere approval of a labeling would preempt a failure to warn claim. It might be too clear for the court. As we indicated in the 28J letter that the government submitted, those broader theories of preemption are potentially implicated in at least one and possibly more cases currently pending before the Supreme Court. Yeah, but that's a medical device case and it's a different statute. What is the narrow form of conflict preemption that you think is before us or that you're arguing that there is preemption at the FDA level? Our position is that where FDA has rejected a particular warning as scientifically unsubstantiated on the basis of the current evidence that a plaintiff may not seek to impose liability under state law for the failure to give precisely that warning. Now, let me ask you. Can I follow up with that? Yeah. Well, I was going to. All right. Well, that's exactly how I read your narrow form of preemption which the government has never said didn't exist in 2000. The statement is very broad and ambiguous and 2006 covers the entire world. And I read your brief supporting only a very narrow ground for preemption so that, for example, if we found in this case that the FDA did not actually make a decision on this labeling issue, then you wouldn't be arguing preemption. I'm just a hypothetical. On theory, a preemption is a narrow one. I certainly would not repudiate the broader view set out in the 2006 preamble. I'm simply not authorized to take a view about how those... Let's go back to Mr. Gerstein's question. Has the FDA specifically rejected a warning similar to the one that Mr. Braslow has suggested should be there? Yes, absolutely. Both before and after the operative events in question. And I think precisely what warning is being sought is quite clear in the opening pages both of Mr. Colachico's initial brief and their diagrams. In what years did it reject those? Well, there are many. Because in 2003, it allowed you to add it for adolescents, correct? That is right. Through the operative events in question, FDA repeatedly determined in 1991, in 1992, in 1997, 2002. Yes, but understand that the scientific evidence appeared to relate either for the entire class of SSRIs or even for the entire class of prescription antidepressants. Starting in 2003, there was a suggestion that use of antidepressants in children might pose an increased risk of suicide. Ultimately, FDA did determine that it did pose such an increased risk, required that warning to be added to the label, and then in the course of investigating whether that risk might increase to young adult or even older adult users, emphasized the need to monitor patients closely. Up to 24, didn't you? Age 24? FDA's current assessment of the scientific evidence is that there is an increased risk in use of antidepressants in children and young adults up to age 24. That there is no showing, no evidence, supporting that association of increased suicide risk in adults age 25 to 64, and that for adults 65 and older, there actually is a decreased risk. Let me answer my question. I've got another one after you. Your regulations provide, give drug manufacturers the right to have supplemental labeling when the drug manufacturer believes, finds evidence to support it. Apparently, that's the question that we discussed before. They can proceed on the basis of those supplemental labeling. If they request an approval for supplemental labeling, how soon does the FDA respond? Well, it depends, Your Honor. Just let me be clear. There is a provision by which manufacturers can add new warnings, new risks based on new evidence, and I think that's not entirely clear in our brief because I don't think the court can reach it. And that's 31070C. Yes, but it is the agency. Well, no. There are two. 31457C relates to older drugs, and there's a different provision for newer drugs and older drugs. 31457C. Right, yes. That's correct, but that provision does not allow manufacturers to add scientifically unsubstantiated warnings. Now, what do you do if a drug manufacturer would have done that which the plaintiffs in this case argue it should have done, which would be to add an increased warning, unlike a precaution of suicidality, does the FDA proceed to monitor all the labels and then say you can't have that, that's misbranded? It certainly would, Your Honor. I mean, I think it would have a range of enforcement opportunities available to it. Obviously, it would have rejected the proposed change since it had consistently rejected precisely that change again and again. It could have potentially taken enforcement action against the affected manufacturer. Have you ever done that? Has the FDA ever told a manufacturer who added an increased warning that that warning was unsubstantiated and caused the drug to be misbranded? I'm not aware of any instance, and I will tell you that that is probably because manufacturers, in line with what FDA recommends they do, come to the agency before they change their labeling for the drug. As the agency explained in the 2006 preamble, the whole process of developing warnings and labeling is an interactive process with the agency and the manufacturer, and manufacturers typically do not unilaterally make substantial changes to their labels precisely because if there is uncertainty in the scientific community or with FDA about whether FDA would approve that drug, they don't want to put themselves at risk of putting a drug in the product that FDA might determine to be misbranded. But frankly, the notion that the regulatory scheme is intended to operate in such a way that manufacturers are obliged to come to FDA again and again, filing applications to make changes that the agency has already rejected is not surely the way that Congress intended for the regulatory scheme to work and would be highly disruptive of FDA's regulatory authority. Let me ask you another question. Oh, sorry. No, go ahead. At least one of the claims here is that the physicians in public were defrauded because the drug manufacturer did not tell FDA everything it knew. Is that preempted? I don't believe that claim has actually been preserved, and if I may just specify, there was an allegation in the initial complaint in Puerto Chico saying something very generally about the agency having been defrauded. In their amended complaint, which articulated in greater detail the fraud allegations, they abandoned that theory. They did not argue that theory, as I understand it, in the district court, and they didn't argue it in any of their briefs in this court until the very last page of their reply brief. So I don't understand there to be a fraud on the agency claim here. We have not taken a position in our brief on a fraud on the agency claim, but obviously Buckman stands as binding precedent. And I might add that there is a- I actually phrased it in terms of the fraud on the-I don't get this, but I'm just asking you the question. The fraud on the public and physicians separate from fraud on the FDA. I don't understand that claim either, to be honest, Your Honor. The way in which manufacturers communicate with physicians is through the labeling for their prescription drug products. To the extent they're claiming that somehow the manufacturer should have given a warning in another form that would be inconsistent with FDA's determination that a particular warning was not scientifically substantiated, I think the same rationale would apply. Is the premise for your position the need for uniformity in drug labeling throughout the country? In part, Your Honor, but I think primarily the need for FDA's expert regulatory authority ultimately to be the final arbiter of what is or isn't on the label. But you don't do your own testing, right? We don't, Your Honor. You're not going to pass the Peter Power, right? We can require manufacturers to undertake additional tests if we think it necessary. We can require more studies to be done. We are entitled to see the results of every study that has been done or clinical test data. We do evaluate that all in the course of both the pre-approval process and the post-approval process. And if they didn't give you, I'm sorry, let me just pick up your question. If they didn't give you that which you asked them to do and you don't have subpoena power, what is your remedy? We can withdraw approval of the drug. We can seek criminal sanctions. We can seek civil sanctions. Have you ever done that? Withdrawn approval of drugs? I mean of drugs in this particular area, SSRIs. No, not in this area, Your Honor. And for good reason because, you know, to be frank, Your Honor, this poses such a stark conflict in terms of the competing interests at stake. The very risk that the plaintiffs seek to add on the warning for the label is itself a product of major depressive disorder. And it is absolutely impossible not to conclude that had physicians been improperly deterred from using this drug with seriously ill patients, there would have been more suicides. And so in these circumstances, surely we need to have some federal agency with the expertise to look at that from a comprehensive standpoint and make a judgment about what is appropriate for the public health rather than to allow, you know, state juries in individual cases with one person in one drug at one time. But hasn't the FDA acknowledged in the past that at times it has been helped immensely by products liability suits in states by virtue of the information that's come out in connection with those suits? That may well be, Your Honor. Although I will note that FDA's post-approval authority has recently been substantially extended by Congress to permit precisely the kind of post-marketing surveillance that outside observers have suggested. But it's easy to understand where they're coming from. There has been a – there were concerns expressed that the taking of certain SSRIs enhanced the possibility of suicide for a segment of the population, adolescents. And so in 2003, you agreed that they can add or they should add to the label an additional warning with respect to adolescents. You've now extended that, as I understand it, to not age 18 but age 24, correct? That's correct, Your Honor. And so then there's evidence or some suspicion that those older than 24 may also have, in certain cases, an enhanced risk of suicide if they take certain SSRIs, correct? That was the concern. And I will say that FDA's judgment about the increased risk with young adults came out of its comprehensive review of all of the test data from all of the manufacturers for all of the drugs for all age users. And it determined that that risk did not exist for adults age 25 and older. And so you're now saying that but for anyone older than 24, what you are requiring to be on the label for SSRIs is both a floor and a ceiling, correct? That is correct. And I will add that the statement that is on the current approved FDA labeling explicitly notes that there is no increased risk of suicide for adult users age 25 and older of the drug, that the scientific evidence does not show that risk. But before, didn't the FDA say that this was a floor, not necessarily a ceiling? FDA had repeatedly rejected the very warning, had repeatedly rejected it in response to citizen petitions, had made repeated determinations in its own internal evaluations, had presented those findings to advisory committee meetings. Advisory committees had concluded that no labeling changes should be made. FDA accepted those conclusions, those recommendations. So I don't think it's correct to say that we're- And for Zoloft and Paxil, when were those first rejections made? The Paxil rejections were made in 91, 92, 97. The advisory committee developments that we cite to and discuss in our brief were made for the class of antidepressants. And, in fact, the advisory committee recommended against making any change to any antidepressants. I want to point out that part of the concern about imposing labeling requirements like this in an individual case is that there was significant concern on the part of the agency and its advisory committee that to the extent there was any risk, it was a risk that expanded beyond a particular drug. It was a risk inherent to the entire class. And that imposing warnings on a drug-by-drug basis would be very misleading to the treating physicians about precisely what risk existed. Before you sit down, I just want to ask you, you made a point that you have asked for antithesis data in a Colachico case. Does that mean that your position isn't necessarily the same in the McNellis case? We did not file a brief in McNellis. We didn't find it necessary to do so. I think the brief filed in Colachico is applicable to the issue raised in McNellis. I'm just not authorized to take a position on how that plays out. Thank you very much. Thank you, Your Honor. All right. We'll hear counsel for Apotex. Oh, we didn't ask him about that. Go ahead. Good morning, Your Honors. May it please the Court, Arthur Keppel on behalf of the Apotex defendants. I would start out by suggesting that perhaps Mr. Braslow has agreed that the manufacture of a generic product up to the point of approval or at the point of approval of the abbreviated new drug application or the AMDA. He said that. What he said was that you have, as I understood it, that you have an independent obligation should information come to your knowledge or your attention, you have an obligation to add a warning to your label even though it's not on, I forget the word, the listed drug. I think that was his decision. Yes, I think that was his argument. However, what he did not mention to the Court is the effect and the impact of the Regulation Act 314.150, which was one of the, actually it was a pre-existing regulation, but it was amended after the Hatch-Waxman Amendments, which amended the FDCA to provide for the abbreviated new drug application process. So the FDA then looked at its regulations to see how must these be modified now to accommodate the charge given it by the Hatch-Waxman Amendments. One of the regulations that was amended was 314.150, and it was amended to say that it will withdraw approval of an ANDA if the FDA finds that the label connected with the drug approved through the ANDA is not the same as, is inconsistent with, the label for the listed drug referred to in the ANDA, needs the drug that the generic product copies. At the time that that regulation was put forth and the amendments recommended, that was in 1989, it was a comment period. During the course of the comment period, it was suggested to the FDA, recall that these were all regulations that were being considered because of the Hatch-Waxman Amendments and the whole process of getting generic drugs forward. There were some suggestions made during the comment period that the generic manufacturer ought to have leave to add safety warnings, contraindications, or other warnings to his label, to the label for the generic product. And the FDA rejected that. The FDA said, no. What is important when you have a generic product? And this was made evident by Congress when it passed the Hatch-Waxman Amendments. What is important is that the generic product be and look in every respect the same as the listed product so that those prescribing the drug would have confidence that it's the same. Assume for the moment, just, you're not conceding anything, so I'm going to preface that. Assume for the moment that you had reasonable evidence of an association between your product and a serious hazard or a serious possibility of enhanced suicide risk. Under Code of Federal Regulations 201-80E, what would be your obligation? Using 201-80E, but also using the 314-150, our obligation would be to take that information to the FDA, advise the FDA of the information. It then would be the FDA's determination whether that represented a substantial relationship. Does that what 201-80E says? Does 201-80E say that you must revise your label if you have, you internally, I'm not saying you do, but if you have internally information that there's an enhanced risk of suicide, those people beyond 24, to take your product? That what the regulatory scheme as a whole would require, and 201-80E creates a duty. That duty, if you are a listed drug manufacturer, is effectuated through 314-70, and depending on which of the categories within 314-70. Well, 314-70 just allows you to have warnings. It provides the mechanism for doing so. If it falls within a certain category, then you do it through a CDE. If it falls within a different category, then you have to follow a different approach. But that's the procedure by which one puts into effect 201-80E. What the FDA has said with regards to the generic manufacturer is that 314-150 controls, and that the generic manufacturer's label may not be different from, and actually Condon says this, may not be different from a listed drug's label. So if you had evidence internally that there's an enhanced risk of suicide, you would go to the FDA, and how long would that take? I do not know the answer to that, Your Honor. Could it take months? That would be, I imagine it would depend on the serious risk. But isn't there a significant possibility that additional people then might have the same consequence that happened here with McNellis, or with Colachico and McNellis' father? And on the basis of the information that was available, we would take it per FDA directive to the FDA, and they would make the determination whether or not the label should be changed. But if you have the information, again, it's an assumption. I'm not saying you do. Other people could then possibly have an enhanced risk of suicide, and other people may commit suicide as a result of taking your product. We would be bound by law to comply with the FDA and to comply with its directives, and our directives would be that as soon as we have that information, it would be as easy. So is the FDA telling you that 201AE you're to ignore until they give you approval to do something different? They're not asking you to ignore 201AE. 201AE creates a duty. Are they requiring that you go through them first rather than act on your own? That's exactly correct, Your Honor. Because there is the bigger issue of the... Does 201AE specifically say you're supposed to go to the FDA? 201AE doesn't, but 201AE simply creates the duty. The procedure by which one implements 201AE is different between generics and branded or listed drugs. So let's assume just for the moment you're right. Why then should you not be able to allow a state to say, in fact, under that circumstance, you should come out immediately with the warning because you have actual information that there's a problem? Because that would put us in violation of 314.150, and that would create the very sort of direct immediate conflict that the Supremacy Clause resolves in favor of the federal regulations. If the Supremacy Clause said that, then why did the 2000 regulations say that there is no conflict, no preempting of state law, and federalism concerns remain fully in place? What we're talking about here in the 2000 statement was not that there cannot be conflict. It cannot be a direct conflict, and that would represent from the generic manufacturer's point of view a direct conflict. In order to comply with the state tort law, the generic manufacturer would be required to violate 314.150. Mr. Kettle, your time is way over. I just want one question. You said that at some hearing when the question came up, the FDA said no, you can't add that. How does the FDA's ruling come to the manufacturers? Does it come by letter? Does it come by order? Does it come by ruling? Like we've been told that the FDA rejected the request for a change labeling in 01, 03, 04, 07. How does that physically come out? Does it come out as an order, as a ruling? The way that it would come to the generic manufacturer, Your Honor, is this is basically what the FDA said in its rulemaking when it amended Rule 314.150. If it doesn't accept the amendment, yeah, go ahead. The listed drug manufacturer would submit a CDE suggesting a change. If the FDA approved that, then the FDA, and this is specifically what the FDA said, the FDA then notifies the generic manufacturer that there's this change in the label and to change the generic label as well. And if they decide not to approve a change, maybe I have to ask Mr. Wheeler that question, how does the FDA's disapproval come to the attention of the industry? Well, it would not come to the attention of the generic manufacturer, Your Honor, because the generic manufacturer has its label as it has been approved until it's told to change the label, either by having brought information to the FDA or because someone else did, and the FDA determined that there would be a change to the label. Okay, that's a great segue from Mr. Wheeler, so I thank you. And we'll pass the time to him. Thank you, Your Honor. Thank you. Good morning, Your Honor. Mr. McCliffe, the court. I'm Malcolm Newers, going on behalf of Pfizer in the McNellis case. I'd like to begin by emphasizing... To begin answering my question, though, it's a caveat. Yes. You know, when the FDA disapproves the proposals or the requests, I guess they were citizens' requests, from what we learned in 01, 03, whenever. How did that disapproval... Specifically, what do you get? A notice in the Federal Register denying the petition in each of those instances. I see, I see. And, Your Honor, those denials are, in fact, in the record. In the record. Which is enormous. Yes. And you're still sitting on the floor by my law firm. Understood. Okay. I want to emphasize, if you have said, may it please the court, how very narrow the conflict issue is that this court has to rule on to resolve the case here. In your case... Yes. I see the question that was certified to us as actually broader than the facts of the case. And so how do we handle that? We just answer a narrower kind of question? I think you only need to answer the narrower question in order to resolve the matter in McNellis, Your Honor. But if the court is inclined to address the broader question, would that be fine with us as well? Because I think in either event, it should come out in our favor. And let me be clear about how our case is even narrower than the Colachico case. I think it was Judge Amaro who asked the question of whether the agency, in fact, spoke to the question... I'm sorry, I wish you'd pressed that slower. Whether the agency ever said it would be misleading. In our case, the answer is it absolutely did. On September 4th of 2002, the government filed an amicus brief in the Ninth Circuit in the Motus case in which it said that not only is there no evidence, no reasonable evidence of an association, but it would be misleading and misbranding for Pfizer to change the labeling to indicate any causal relationship. The event in our case occurred only four months later, on January 30th of 2003. Is it fair that a litigating position by the FDA taken in one case should be deemed the FDA's official position for all SSRIs? The answer there is... Well, the answer in two parts. First, it was Zoloft. The Motus case was a Zoloft case, and the precise issue addressed in that amicus brief was Zoloft and suicidality and the language in the labeling. Now, to answer your broader question, whether that should apply to the entire category, I would say, given the history in this particular case, namely of SSRIs, that the FDA's having treated SSRIs as a class for a decade, the answer is yes, that is exactly how the FDA treated it, and so it should indicate what the government's position was with respect to the entire class. And we should assume that all drug manufacturers and all plaintiffs' lawyers and all physicians knew about that? It certainly did, Your Honor, especially because this litigation was against all the SSRI manufacturers throughout this period. The filing of that brief was not a secret. It was obviously a public document and was cited in all the subsequent litigation. I suppose from your point of view, all that matters is that the manufacturer of Zoloft got the word from FDA. Exactly, and I'll go even further. Not only did the FDA take that position in September of 2002, just four months before the incident in our case, but in March of 2003, I'm sorry, 2004. On March 11th of 2004, the commissioner of the FDA testified before Congress and in direct response to a question from Congress said, yes, we did consider this and, yes, we meant it when we filed that brief in September of 2002 as to Zoloft. It's such a clear conflict. Shouldn't we require that the FDA, when it's going to do something like that, do it by rulemaking or by some process, by some more official process than filing a brief in a litigating case? Similar to what they did for adolescents. No, the answer is there's no reason the FDA couldn't do that, but there's not a reason to require it, which is your question, Your Honor, and the reason there shouldn't be a requirement is that FDA had addressed this precise issue in the actual rulemaking every single time, all seven times that it approved this drug for various indications, and in each instance it required, it literally required, that the labeling has to say identical, the identical language that was in the letter approving the drug from the FDA. There's just something wrong, I think, having a litigating position become the FDA policy. Thank you. We're not just relying on the litigating position, and let me say two things about that. First, it's not a litigating position in which the FDA or the government was a party. This was a position taken in an amicus brief in which the government was expressing its concern about the public health issues that were implicated, and it was merely restating what it had said for all the years since 1991. Prior to 2003, had the FDA taken positions  I'm sorry, Your Honor? Prior to 2003, had the FDA taken positions in suits involving plaintiffs on behalf of adolescents? Not that I know of, Your Honor, and I think I would know if it had, and it did that, of course, in the 2005 amicus brief that it filed in the Callis case. Had it previously rejected applications to enhance warnings for adolescents prior to 2003? Not specific applications by a manufacturer, but it addressed that question. Certainly, in 1991, when it held the Psychopharmacological Drugs Advisory Committee meeting, and the question was, should there be any change in the warning at all for antidepressants, including any of the SSRIs? And the answer by that expert advisory committee was no, and therefore the agency did not, in fact, see if any new warning on adolescents was necessary. In addition, Your Honor, in 1996, in connection with a new application by Pfizer for Zoloft, they specifically, the FDA specifically, requested an analysis of all the data with respect to pediatrics and separately with respect to adults, and Dr. Loughran, who was the relevant FDA physician at the time, specifically said and found there was not even a signal of any indication of a causal relationship between Zoloft... What was the tipping point, then, for the change in position with respect to adolescents and then later extending that to young adults up to age 24? The tipping point was because GlaxoSmithKline voluntarily went forward and informed the FDA of some study results and said, here are these results, and what the FDA did as a result of that was to conduct a new analysis, pooling the data from nine different drugs, not just SSRIs, but nine different antidepressants, to say, when we pool all the data from these various antidepressants, does it indicate any signal that suggests that we ought to do something other than what we've done in the past? And that's what caused it. And by the way, a very important thing here, this was therefore not data that was available to Pfizer. This was the pooling of data from nine different drugs, most of which were from other manufacturers. So in our case, as of January 30, 2003, it's a fact that the FDA had found that there was no reasonable evidence of association. So to go back to... Association of increased suicide risk for greater than 24 or for everybody? For anybody, even to this day, Your Honor. Even to this day, the FDA has not found that there is reasonable evidence of association of suicide and Zoloft. So why was the change made in 2003 and then later added six years? Because they decided to include all antidepressants. That's the really crucial point here. In other words, your point is that Zoloft is different than the other SSRIs? Is that what you're telling us? Yes, of course, Your Honor. It's a different chemical formulation. And it goes back to my response to Judge Rustani earlier. They're treated as a category because the FDA... And again, mind you, the change that we're talking about that was made in each of the changes made after 2003 were not just made to SSRIs. It was made to the entire category of 32 antidepressants, of SNRIs, SSRIs, the older formulations of antidepressants across the board. The FDA provided a very conservative approach. I mean, to its credit, once it decided that there may be a risk for some of these drugs, they decided, we're going to change the approach, we're going to, in fact, tip the balance differently from how we had been tipping it for a decade, and we're going to require it on an antidepressant-wide basis. I want to turn to a couple of the questions that the court asked... Okay, within the time. I've just told Judge Ann that we're going to have to keep you to your time. We're way over. Go ahead. I understand. Thank you, Your Honor. I want to come back to a couple of the questions that were asked. First of all, Bates. The Bates case is totally inapplicable here. In Bates, there was a savings clause, and the Supreme Court had to address that savings clause, and that was a very important part of how the court ruled. Secondly, in Bates, the court specifically found, as the agency, the EPA, had expressly said, the EPA did not, in fact, even evaluate efficacy at all, and that, the court emphasized, was one of the important aspects of its ruling. But here, the FDA definitely evaluates both efficacy and safety, and one of the most important things that the FDA has repeatedly said, from 1991 even to the present, is grave concern that the public safety will actually be harmed if labeling goes too far in terms of the warning that gets made. That's just a question I had asked earlier. Yes. And the last thing I want to mention in my remaining minute is the issue of consistency. In fact, there really is, Judge Ambrose, and I'll answer it directly, but there is no inconsistency between the position the agency took in the 2000 Federal Register and the position it takes on this issue. The statement that Your Honor referred to is a statement that addresses field preemption. All the agency was saying is that there are no federalism implications to the amendments, to all of the regulations that they were amending, proposing in that NPRM in 2000, that they weren't saying all of our prior decisions about conflict preemption are out the window. In fact, one month earlier, in November of 2000, in the Southern District of New York, the government... By the time of 2000, were there people making allegations that were state law-based? Yes. And were they preempted? I'm sorry? Were they preempted? Yes. In the Bernhardt case in the Southern District of New York, the precise issue was whether the common law claims that were asserted there... And there's a lot of cases that say that they were not preempted. Is that correct? Not where this kind of a conflict was an issue, Your Honor. No, I know of none. In fact, there are multiple instances in the Federal Register where the agency took the position explicitly that common law claims of certain kinds would be preempted. And the one that we have here is the clearest conflict that I'm aware of, frankly, in the history of the FDA. Thank you, Mr. Wheeler. Thank you. Thank you very much. We'll hear Mr. Braswell for his five minutes of rebuttal, and I'm going to keep you to that. Thank you, Your Honor. I guess the first thing I'd like to address is the point made by the attorney for the generic manufacturer with respect to his cite to 21 CFR 150B10. And that doesn't say... That's my question. It doesn't say that the FDA will withdraw approval of the generic drug if it differs from the brand name. No, but what he's saying is that if they had... Assuming they had internal information that there is an increased chance of suicide risk for somebody older than 24, they can't just go and amend the label unilaterally. They have to go to the FDA and ask if they can amend the label. Right. That's not what 150B10 says, and that's not what the regulations require. I urge this panel to look at the plain language of the regulations. What does the regulation require? The regulation specifically requires them to strengthen their label as soon as they become aware of a risk with their drug. And they don't need FDA approval first, and B10 doesn't say they have to get approval first. You're relying on the prior regulation that was before the Hatch-Waxman Act, right? The one that's always been there. What's this number, 314.70? No, I'm talking about the one he relied on, which was 150B10. Oh. He said they had to withdraw the label. They would have to withdraw approval of the generic if it was no longer consistent. That's not what that regulation says. Second of all, let's look at specifically what happened in this case with respect to the regulatory history of these drugs. In 1991, the FDA found that they made a determination under their committee, made a scientific determination that Prozac, the drug standing in the presence of Prozac, didn't warrant a strengthened label. But what they said was they need more information. So what happens 10 years later after they look at the same data that they were looking at all along? Well, in March 2004, they actually do. All the drug companies, in May 2004, the drug company GSK in particular strengthens the label regarding worsening, depression, and increased suicidality. What happens the next year, in May 2006? Let me direct the court to A1069 of the appendix. You said GSK changed in 2002? In 2004, March 2004. And by the way, we're talking about things that have happened after the event in question. Yeah, but with the approval of FDA. I'm sorry? With the approval of FDA. No, the FDA doesn't approve these warnings as a general matter. They don't have to. In other words, they don't have to do that. What GSK did was they, on their own, independently, strengthened their warning in May 2004 to warn about increased suicidality and worsening depression in everyone, not just the children. And then if you look at A1069 of our appendix. Was that ever approved by the FDA? Was it ever approved? Yeah. Well, the fact that the FDA didn't reject it. No. Was it ever affirmatively approved by the FDA? Not that I'm aware of, Your Honor. But they don't have to. The fact that they didn't reject it means that they accept it. Are you talking about saying that your patients are depressed, you should be careful, they might commit suicide? Are you talking about that kind of warning? No. I'm not talking about that. There was specifically in bold letters a new warning with respect to increased suicidality and worsening depression in May 2004. But I want to get to this point. For whom? For everyone. For all patients. In which drug? For laxatives and condoms. Okay. So for laxatives. Yes. And then they did it again in May 2006. They warned health care professionals, and this is for all adults, and this is a letter in May 2006 to your health care professional. Further, in the analysis of adults with MDD, all ages, the frequency of suicidal behavior. But they have letters. Were the labels changed in those two years? Yes, Your Honor. Yes, Your Honor. Glaxo changed the label on their own without FDA approval, and that's what we're talking about here. GlaxoSmithKline did this on their own. Your Honor, I think you hit the point directly on the head when you were talking about, you know, what's the conflict here? Is this a real conflict or a hypothetical or a false conflict? I would stop you, Charlie. Is this a real conflict or a false conflict or a hypothetical conflict? In this situation, look at what happened here. It was never proposed a strengthened warning. It was never rejected. And even if it was rejected, the FDA would have to seek an enforcement action, which it's never done in the history of the FDA. And then, guess what they would have to do after that? The enforcement action would come before a court, just like we're here today, and a court would decide whether or not the label was appropriate or not. And that's where we are. Thank you very much. Thank you. We at the Sanford Council, obviously in a certain case, we would like to transcript the argument. I think we'll have a glove company provide it. I think if we look at the stock market, we can ask the glove company to take the responsibility. I didn't say that. For providing. Now, the one thing I will ask you is before you send the copies and you transfer to the court, I want everybody who argues to have an opportunity to review the draft that the stenographer provides to be sure that it, you can't change anything, but be sure that it accurately represents that which you said, because stenographers don't know this field as well as you people do, so that when we get it, we get something that is coherent. Okay? Thank you. We'll take the matter under advisory. Thank you.